## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| East Central Regional Water District, | |
| Plaintiff, | |
| vs. | **ORDER** |
| City of Grand Forks, North Dakota, | Case No. 3:20-cv-208 |
| Defendant and Third-party Plaintiff, | |
| vs. | |
| William J. Brudvik and Ohnstad Twichell, P.C., | |
| Third-party Defendants. | |

Before the Court are two motions. The first is a motion for partial summary judgment filed by Plaintiff East Central Regional Water District ("East Central") on May 14, 2021. Doc. No. 28. On June 4, 2021, Defendant City of Grand Forks (the "City") filed a response in opposition to the motion. Doc. No. 31. East Central filed its reply on June 25, 2021. Doc. No. 42. The second motion is the City's motion to certify a question to the North Dakota Supreme Court, filed on June 4, 2021. Doc. No. 34. East Central filed a response in opposition on June 18, 2021. Doc. No. 38. On June 25, 2021, the City filed its reply. Doc. No. 43. For the reasons below, both motions are denied.

## I.    BACKGROUND

At the center of this action is a decades-old water supply and service agreement between the City and East Central. For the purposes of its partial summary judgment motion, East Central asserts the agreement is void *ab initio* pursuant to North Dakota Century Code section 6-09.4-22 because the Bank of North Dakota was not a party to the agreement. That statute, among other things, prohibits political subdivisions, like the City, from curtailing or limiting water services provided by water districts or other political subdivisions, like East Central, when the construction

or improvement projects to provide such services were financed by a public financing authority. The statute also expressly protects public financing authorities that lend money to water districts, like East Central, for construction and improvements to provide water services by requiring the public financing authority to be a party to any agreement that addresses curtailing or limiting water services between political subdivisions. Accordingly, per East Central, because the Bank was not a party to the agreement, the agreement is void in its entirety.

### A.    The Parties and the Negotiations

With that framework in mind, a brief introduction of the parties is necessary. The City is a municipal corporation that provides, among other things, water services to its residents. East Central is a water district with defined boundaries that also provides water services to rural residents of Grand Forks County. East Central, however, has a complex organizational evolution: it began as non-profit corporation, re-organized into a water district, and then ultimately merged with another water district to create East Central.

East Central's original predecessor was Grand Forks – Traill Water Users, Inc. ("GFT"), a non-profit corporation. Doc. No. 30, p. 1; Doc. No. 30-1. GFT was created "for the specific purpose of providing a water supply and water pipeline distribution system to rural families, and families in small incorporated and unincorporated cities not having a common water supply distribution system." Doc. No. 30, p. 1; Doc. No. 30-1.

In the early part of 1998, GFT began negotiations with the City and another water district, Agassiz Water Users District ("Agassiz"). See Doc. No. 32, p. 1. The purpose of these negotiations was to address whether and how GFT, the City, and/or Agassiz would provide potable water and fire protection services in areas the City annexed or was likely to annex in the future. Id. Discussion points included whether GFT would retain existing customers, among other things. Indeed, in a

November 6, 1998 letter, a City representative asked GFT whether it would "consider retaining existing customers annexed into the city limits?" Doc. No. 32-1, p. 1. GFT responded, "No; we want out." Doc. No. 32-2, p. 1. Ultimately, negotiations concluded by the end of 1999, and the parties entered into the agreement at issue here in early 2000. Doc. No. 32, pp. 2-3.

 **B.**  **The Agreement**

 On January 24, 2000, GFT, Agassiz, and the City executed the "Agreement Between The City of Grand Forks[,] Grand Forks Traill Water Users, Inc.[,] and Agassiz Water Users District" (the "Agreement").[1] Doc. No. 30, p. 1. The Agreement acknowledged that, at the time, GFT was organized as a rural water system. Doc. No. 30-2, p. 3. As such, GFT's boundaries were "not clearly defined but encompass[ed] rural areas not otherwise served by a municipal water system[.]" Id., p. 4. It further acknowledged that the City has "in the past, annexed certain portions of the territory served by [GFT] / Agassiz and will, in the future, be annexing additional territory within their service areas because of the City's need for expansion away from the river flood plain." Id.

 To that end, GFT, Agassiz, and the City (together, the "Parties") stated they were "desirous of avoiding conflict in providing potable water and fire protection service within predefined boundaries of the territory which are or will be annexed by the City." Id. They therefore sought to "enter into a comprehensive agreement to deal with existing annexations and future annexations so that the rights, duties and obligations of the City and [GTF] / Agassiz [would] be known in

---

[1] The Court notes that Agassiz, an additional party to the Agreement, is not presently a party to this action.

advance of such action by the City."[2] Id. Accordingly, the Agreement was binding on all the Parties and "their successors and assigns." Id.

Pertinent to the partial summary judgment motion, the Agreement defines the City's "Growth Area." Id., p. 6. The Growth Area identifies "those areas where [GFT] / Agassiz currently have infrastructure installed and are supplying water service which may be taken over by the City, and areas where [GFT] / Agassiz currently have capacity to serve potential customers to the extent shown." Id. The Growth Area is depicted on a map and attached to the Agreement as Schedule A. Id. It identifies four separate areas, which are labeled Parcels A through D.[3] Doc. No. 30-2, pp. 12-14; Doc. No. 32, p. 1-2.

Naturally, the Agreement also addressed compensation. Under the Agreement, GFT "would be initially compensated for the loss of potential but non-existing customers within Parcel C and Parcel D of the City's Growth Area." Doc. No. 32, p. 4. After the initial payment, the City was obligated reimburse GFT/Agassiz for any potential or existing customers that it would take over pursuant to the Agreement. See Doc. No. 30-2, pp. 8-10. Likewise, GFT/Agassiz would reimburse the City for obtaining customers in those areas where they are "able to utilize capacity after such capacity has been sold to and paid for by the City." Id., p. 11. As contemplated under

---

[2] Within the Agreement, the Parties recognized that "such annexations are governed by North Dakota Century Code Section 6-09.4-22 and Federal Statute 7 U.S.C. Section 1926(b)[.]" Doc. No. 30-2, p. 4.

[3] Parcel A is located on the western outskirts of the City along U.S. Highway 2. Doc. No. 32, pp. 1-2. Parcel B is located on the southwestern outskirts of the City. Id. Parcel C is located on the southern outskirts of the City. Id. Lastly, Parcel D is located on the southeastern outskirts of the City. Id.

the Agreement, on February 23, 2000, the City made an initial payment of $261,893.10 to GFT.[4]

Doc. No. 32, p. 5; Doc. No. 32-5.

Approximately three months after entering into the Agreement, GFT adopted a Resolution approving the filing of a Petition to Organize the Grand Forks-Trail Water District (the "Petition"). Doc. No. 33-1, p. 14. The Petition, dated July 19, 2000, contained several statements in support of GFT's reorganization as a water district, including:

> 7.  [GFT] recently completed an extensive long-term agreement with [the City] for compensation and resolution of compensation for members lost to growth by [the City] into service areas of [GFT]. The agreement redefined a growth boundary for annexation purposes by [the City], and set forth standard compensation formulas and control agreements until such time as a formal annexation by [the City] occurs. This boundary is shown on the system layout map referenced above.

Id., p. 15.

On August 24, 2000, the State Engineer entered Findings of Fact, Conclusions, and Administrative Order No. 00-5 ("Order No. 00-5"). Doc. No. 30-5. Per Order No. 00-5, GFT was reorganized as the Grand Forks-Trail Water District ("GFT District") effective September 1, 2000. See id. As a water district, GFT District "is comprised of" the property that Order No. 00-5 identifies. Id., pp. 6-9. To that end, Mark Walker, an Assistant City Engineer for the City, compared GFT District's "boundary area" (as described in the Order No. 00-5) with the Growth Area (as articulated in the Agreement). Doc. No. 32, p. 3. According to Walker, "none of the areas" described in Order No. 00-5 are "within" the Growth Area. Id.

### C.    Post-Agreement Expansion

A few years later, in 2004, the City expanded into Parcel D of the Growth Area, converting six of GFT District's customers to its water service. Doc. No. 32, p. 6; Doc. No. 32-7. Under the

---

[4] GFT used the $261,893.10 to pay off a "$555,000 R.U.S. Note." Doc. No. 32, p. 6; Doc. No. 32-6, p. 1.

Agreement, the City was obligated to pay GFT District for these six customers. Doc. No. 32, p. 6; Doc. No. 32-7.

From 2003 to 2006, however, GFT District also expanded into the Parcel D of the Growth Area, providing services to nine new customers. Doc. No. 32, p. 6; see Doc No. 32-7. These nine new customers were included in the Agreement as potential but non-existing customers. Accordingly, the City had already paid GFT for these nine customers. Doc. No. 32, p. 6. As GFT's successor in interest, GFT District was required to reimburse the City for these nine customers. Id.

The City and GFT District ultimately agreed to "swap" six of their respective "new" customers, negating the need of either paying the other for those six customers. Doc. No. 32, pp. 6-7; see Doc. No. 32-7. But, GFT District had three remaining new customers that were not included in the swap. Id. Accordingly, GFT District paid the City $11,049 for these three customers per the terms of the Agreement. Id.

Roughly ten years later, in 2016, and again in 2018, the City expanded again – this time into Parcel A. Doc. No. 32, p. 7. To calculate the amount of its payment for this expansion, the City requested information—including existing debt load, number of customers, and revenue—from GFT District. Id. The City contends that "[d]espite repeated requests, no such information has been provided." Id.

### D.     Merger to Form East Central

In its most recent organizational form, GFT District merged with Traill Rural Water District ("Traill District") to create East Central in early 2018. Documentation from the merger explains that East Central will serve the areas "which have previously been submitted and are on file with the State Engineer for both [GFT District] and [Traill District.]" Doc. No. 33-2, p. 9. East Central's service areas, however, do "not include property in any other water district and [do] not

include property presently served by water districts other than [GFT Corporation and Traill District]." Id.

On February 26, 2018, the State Engineer executed its "Findings of Fact, Conclusions, and Administrative Order No. 18-2" ("Order No. 18-2"). Doc. No. 32-4. Order No. 18-2 merged GFT District and Traill District to create East Central, effective March 1, 2018. Id., p. 3. Per Order No. 18-2, East Central "is comprised of the lands as shown on Attachment 1." Id. Walker compared East Central's "boundary area" (as set forth in Order No. 18-2) with the Growth Area (as described in the Agreement). Doc. No. 32, pp. 3-4. Based on this comparison, Walker asserts that "none of the boundary area of East Central" is within the Growth Area. Id.

### E.      Indebtedness of GFT, GFT District, and East Central

Another critical issue relevant to the partial summary judgment motion is East Central's indebtedness to a public financing authority. East Central asserts that at the time it entered into the Agreement, GFT was indebted to the Bank of North Dakota (the "Bank").[5] Doc. No. 30, p. 2. East Central further asserts that this indebtedness "continued through the creation of GFT District, and the merger of GFT District and [Traill District], to create East Central." Id., pp. 2-3.

To this end, East Central provided several Financial Statements, together with Independent Auditor's Report (the "Financial Documents") spanning from 1999 to 2018.[6] With the exception of the Financial Documents for 1999, each of the Financial Documents provided contain a variation of the following limitation:  the documents specify that they are meant to be used by

---

[5] The Court notes, and neither party genuinely disputes, that the Bank was not a signatory to the Agreement. See Doc. No 30-2, pp. 15-16.

[6] See Doc. No. 30-3 (Financial Documents for 1999 – GFT Corp.); Doc. No. 30-4 (Financial Documents for 2000 – GFT District); Doc. No. 42-7 (Financial Documents for 2003 – GFT District); Doc. No. 42-8 (Financial Documents for 2008 – GFT District); Doc. No. 42-9 (Financial Documents for 2012 – GFT District); Doc. No. 42-10 (Financial Documents for 2018).

specific parties—such as the organizational entity or the lending institutions—and should not be used by anyone other than these specified parties.[7]

As set forth by East Central, for the purposes of the partial summary judgment motion, there appear to be four debts at issue – (1) a Note payable to the Bank dated January 21, 1986 (the "1986 Note") (Doc. No 30-3, p. 11.); (2) a Note payable to the Bank dated February 22, 1989 (the "1989 Note") (Doc. No 30-3, p. 11); (3) a Note dated June 10, 2003, with the Municipal Bond Bank (the "2003 Note")[8] (Doc. No. 42-7, p. 14); and (4) a Bond payable to the North Dakota Public Financing Authority dated September 1, 2007 (the "2007 Bond") (Doc. No. 42-8, p. 21). On behalf of East Central, Breidenbach alleges that each of these debts was incurred for the purpose of "constructing or acquiring and/or improving the water facilities of East Central." Doc. No. 42-4, p. 1. East Central provides a "State Loan Summary" table (Doc. No. 42-5) to support the same conclusion, though the summary is not dated and provides limited original information about each of the four debts.

## F.      Procedural Posture

East Central filed its complaint against the City on November 12, 2020. Doc. No. 1. On May 14, 2021, East Central filed this Summary Judgment Motion. Doc. No. 28. In its motion, East Central contends that the Agreement is void *ab initio* under North Dakota Century Code section 6-09.4-22 because at the time the Agreement was executed, GFT was indebted to Bank, and the Bank "was not made a party" to the Agreement as required under section 6-09.4-22. Doc. No. 29, p. 2. The City, in its response, argues the following: (i) the Court should deny as premature, or

---

[7] See Doc. No. 3-4, p. 16; Doc. No. 42-7, p. 18; Doc. No. 42-8, p. 25; Doc. No. 42-9, p. 25; Doc. No. 42-10, p. 25.

[8] The Financial Documents for 2012 list this debt as "Bonds Payable – ND Municipal Bond Bank." Doc. No. 42-9, pp. 21-22.

defer consideration of the partial summary judgment motion under Federal Rule of Civil Procedure 56(d), (ii) the Court should certify a question to the North Dakota Supreme Court, and (iii) the Court should deny the partial summary judgment motion because North Dakota Century Code "does not provide support for voiding" the Agreement. See Doc. No. 31, pp. 1-2.

As to the certification issue, the City filed a sperate motion for certification to the North Dakota Supreme Court. Doc. No. 34. East Central filed a response, claiming there is no close legal question and arguing that granting the motion to certify would "effectively change the venue" to state court. See Doc. No. 38. The Court addresses East Central's partial summary judgment motion first.

## II.   LAW AND ANALYSIS

### A.   Summary Judgment Standards

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)).

"At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." <u>Nunn v. Noodles & Co.</u>, 674 F.3d 910, 914 (8th Cir. 2012) (citing <u>Anderson</u>, 477 U.S. at 249). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)). Rule 56 requires a proper summary judgment motion to be opposed by the kinds of evidentiary materials listed in Rule 56(c), such as depositions, documents, affidavits or declarations, stipulations, admissions, and interrogatory answers. <u>See</u> <u>Celotex</u>, 477 U.S. at 324.

## B.     Discussion and Analysis

### 1.     Objection and Request to Strike

The Court first addresses the City's objection to the Declaration of Neil Breidenbach (the "Breidenbach Affidavit"). East Central filed the Breidenbach Affidavit in support of its motion. Doc. No. 30. The City requests that the Court strike certain paragraphs of the Breidenbach Affidavit that, it claims, contain "improper legal conclusions." <u>See</u> Doc. No. 31, pp. 11-12.

Under Federal Rule of Civil Procedure 56(c)(4), "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56. "When an affidavit contains a statement made without personal knowledge, consisting of hearsay, or purporting to state legal conclusions as fact, the statement may not be used to support or defeat a motion for summary judgment." <u>HM Compounding Servs.,</u>

LLC v. Express Scripts, Inc., No. 4:14-CV-01858 JAR, 2017 WL 467499, at *2 (E.D. Mo. Feb. 3, 2017) (internal citations omitted). "It is well-established that matters of law are the province of the trial judge." Sailer v. City of Williston, No. 4:14-CV-069, 2016 WL 11709314, at *3 (D.N.D. Nov. 14, 2016) (citing Southern Pine Helicopters, Inc. v. Phoenix Aviation Mgrs., Inc., 320 F.3d 838, 841 (8th Cir. 2003)).

After review, the Court finds that many[9] of the challenged statements are not factual statements but are legal conclusions. The Court determines questions of law. Accordingly, the Court will not consider the legal conclusions in the Breidenbach Affidavit in ruling on the motion for partial summary judgment. It is not necessary to strike the statements, however, so the City's request to strike is denied. See Citimortgage, Inc. v. OCM Bancorp, Inc., No. 4:10CV467 CDP, 2011 WL 1594950, at *2 (E.D. Mo. Apr. 27, 2011) (denying motion to strike but noting the court need not rely on legal conclusions).

## 2.    Motion for Partial Summary Judgment

East Central moves for partial summary judgment on count three on its complaint, which challenges the validity and enforceability of the Agreement under North Dakota Century Code section 6-09.4-22. Doc. No. 1, ¶ 35. Specifically, East Central posits that the Agreement is void because the Bank was not a party to the Agreement as required by the statute. In response, the City argues, in part, that granting summary judgment at this stage of the litigation would be premature and that there are several genuine issues of material fact. See Doc. No. 31.

---

[9] The statements in paragraphs 5 and 10 related to "indebtedness" and "water service" are appropriate factual statements.

Neither party disputes that East Central's motion is based on the statutory interpretation of North Dakota Century Code section 6-09.4-22. Id., p. 15. North Dakota Century Code section 6-09.4-22 states:

1. The service provided or made available by a political subdivision through the construction or acquisition of an improvement, or the revenues therefrom, financed in whole or in part with a loan to the political subdivision from the public finance authority or any other state agency or enterprise, may not be curtailed or limited by inclusion of all or any part of the area served by the political subdivision within the boundaries of any other political subdivision, or by the granting of any private franchise for similar service within the area served by the political subdivision, during the term of the loan. The political subdivision providing the service may not be required to obtain or secure any franchise, license, or permit as a condition of continuing to serve the area if it is included within the boundaries of another political subdivision during the term of the loan.

2. Under the circumstances described in subsection 1, nothing prevents the two political subdivisions, with the public finance authority or other state agency or enterprise, from negotiating an agreement for the right or obligation to provide the service in question, provided that any agreement is invalid and unenforceable unless the public finance authority or other state agency or enterprise is a party to the agreement and unless the agreement contains adequate safeguards to ensure the security and timely payment of any outstanding bonds of the public finance authority issued to fund the loan.

N.D. Cent. Code § 6-09.4-22. Under North Dakota law, "[t]he primary purpose of statutory interpretation is to determine legislative intent." Bolinske v. Jaeger, 2008 ND 180, ¶6, 756 N.W.2d 336, 339 (per curiam). "[T]he Legislature's intent must be sought initially from the statutory language." Olson v. Job Serv. N. Dakota, 2013 ND 24, ¶ 5, 827 N.W.2d 36, 40. "Words used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears[.]" N.D. Cent. Code § 1-02-02. "Statutes are construed as a whole and are harmonized to give meaning to related provisions." Rasnic v. ConocoPhillips Co., 2014 ND 181, ¶ 14, 854 N.W.2d 659, 662 (citing N.D. Cent. Code § 1-02-07).

Relying on a plain language interpretation, East Central asks that the Court find, as matter of law, that the Agreement is "void *ab initio* as invalid and unenforceable" pursuant to subsection 2 of North Dakota Century Code section 6-09.4-22. Doc. No. 28, p. 1. At a surface level, this is an appealing argument because subsection 2 states that an agreement is "invalid and unenforceable unless the public finance authority or other state agency or enterprise is a party to the agreement."[10] N.D. Cent. Code § 6-09.4-22. And here, neither party disputes that the Bank did not sign the Agreement. Thus, according to East Central, per the plain language of subsection 2, the Court must find that the Agreement is void as a matter of law.

Upon closer examination, however, East Central's argument breaks down. What seemingly presents as a purely a question of law actually depends on several threshold questions of fact. For example, under the plain language of the statute, subsection 2 only applies "under the circumstances described in subsection 1." N.D. Cent. Code § 6-09.4-22. The circumstances described in subsection 1 include various predicate requirements that the parties must satisfy for the statute, and particularly subsection 2, to apply in the first place. For instance, subsection 1 notes the curtailment is prohibited in the "area served by" East Central. Additionally, subsection 1 only applies when the services, provided through the construction or acquisition of an improvement, were financed in whole or in part with a loan from a public finance authority. Accordingly, before the Court can reach its argument under subsection 2, East Central must first establish the absence of a genuine issues of material facts concerning these threshold requirements under subsection 1.

---

[10] The Court recognizes the other requirement of subsection 2 is that the "the agreement contains adequate safeguards to ensure the security and timely payment of any outstanding bonds of the public finance authority issued to fund the loan." N.D. Cent. Code § 6-09.4-22. Because the parties do not take issue with this portion of the Century Code, however, the Court will not address it at this time.

When considering subsection 1 and its requirements, the Court must construe the record in the light most favorable to the City and draw all reasonable inferences in its favor. In doing so, the Court finds there are several genuine issues of material facts. First, there are several material issues of fact concerning the indebtedness of East Central and its predecessors at the time the Agreement was signed. These fact issues include, but are not limited to, the specific purposes of the debts and the timeline of indebtedness. At the time the Agreement was executed, the debts at issue as identified by East Central are the 1986 Note and the 1989 Note. However, on close review, the 1999 and 2000 Financial Documents do not provide any information as to the purpose of the 1986 Note and the 1989 Note. Beyond that, the "State Loan Summary" (Doc. No. 42-5) provided by Each Central only provides a conclusory statement that parrots section 6-09.4-22 and states both Notes were "for the purpose of construction of and/or improvements to the water facilities at East Central." Doc. No. 42-5. The summary table does not provide any original information as to the purpose of each Note. Put simply, on the record before the Court at this juncture, the documentation does not provide sufficient information to ascertain the purpose of each Note and only raises additional fact questions about the purpose of each Note.

Second, there are several material issues of fact concerning the Growth Area, "areas served by," and boundaries of East Central and its predecessors. By way of example, GFT lacked defined boundaries when it signed the Agreement in January of 2000. Although its boundaries were defined after its reorganization as a water district, Walker attests that none of GFT District's "boundary area" was within the Growth Area. Similarly, even after its merger to create East Central, Walker still attests that none of East Central's "boundary area" was within the Growth

14

Area.[11] Relatedly, there are questions regarding whether East Central and its predecessors provided or were able to provide services to the areas at issue. These threshold questions of fact preclude summary judgment and require further discovery.

Construing the record in the light most favorable to the City, and drawing all inferences in its favor, genuine issues of material fact abound, particularly as to the question of boundaries and indebtedness. As a result, partial summary judgment in East Central's favor pursuant to Federal Rule of Civil Procedure 56 is inappropriate and must be denied.

### 3.      Motion for Certification

In response to the partial summary judgment motion, the City moved to certified three questions to the North Dakota Supreme Court. See Doc. No. 34, p. 1. East Central argues there is no close legal question and that granting the motion to certify would "effectively change venue of this litigation from the federal court to a state supreme court." Doc. No. 38.

Under North Dakota Rule of Appellate Procedure 47, the North Dakota Supreme Court may answer certified questions of law "when two conditions are met: (1) the legal question 'may be determinative of the proceeding,' and (2) 'there is no controlling precedent.'" Blasi v. Bruin E&P Partners, LLC, 2021 ND 86, ¶ 6, 959 N.W.2d 872; N.D. R. App. P. 47. As explained by the Eighth Circuit Court of Appeals:

> Whether a federal court should certify a question to a state court is a matter of discretion. See Perkins v. Clark Equip. Co., 823 F.2d 207, 209 (8th Cir. 1987). As the D.C. Circuit has stated: "The most important consideration guiding the exercise of this discretion . . . is whether the reviewing court finds itself genuinely uncertain about a question of state law[.]" Tidler v. Eli Lilly & Co., 851 F.2d 418, 426 (D.C. Cir. 1988). We have expressly held that without a "close" question of state law or the lack of state sources, a federal court should determine all the issues before it. Perkins, 823 F.2d at 209.

---

[11] The Court makes no conclusions regarding whether the area served by an entity is the same as its boundary area. Either way, genuine issues of material fact exist.

<u>Johnson v. John Deere Co., a Div. of Deere & Co.</u>, 935 F.2d 151, 153-54 (8th Cir. 1991).

On the current (and limited) factual record before the Court, and at this point in the case, the Court finds that certification would be premature, particularly considering the questions of fact highlighted above. Further discovery and development of the factual record is necessary before the Court can determine whether a "close" question of state law exists and whether a legal question may be determinative of the proceeding. Accordingly, the Court declines to exercise its discretion to certify questions to the North Dakota Supreme Court at this time, and the Court denies the motion to certify. Nothing in this order shall prohibit a party from revisiting the question of certification as the case progresses, if necessary.

## III.   <u>CONCLUSION</u>

The Court has reviewed the record, the parties' filings, and the relevant legal authority. East Central's motion for partial summary judgment (Doc. No. 28) is **DENIED**. Additionally, the City's motion to certify (Doc. No. 34) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 16th day of November, 2021.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court
