**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | | |
|---|---|---|
| East Central Water District, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| | ) | |
| vs. | ) | Case No. 3:20-cv-208 |
| | ) | |
| City of Grand Forks, North Dakota | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| William J. Brudvik and Ohnstad Twichell, | ) | |
| P.C., | ) | |
| | ) | |
| Third-Party | ) | |
| Defendants. | ) | |

Indebted rural water districts are protected from incursion by their municipal neighbors. Congress' fear was that indebted rural water districts would lose customers to growing cities, leaving the shrinking water districts unable to pay their debts. Twenty-five years ago, the growing City of Grand Forks ("the City") and two rural water districts—one of which is a predecessor of Plaintiff East Central Water District ("East Central")—signed an agreement to account for these protections. The Agreement governed the parties' behavior for decades until it was recently declared *void ab initio*—meaning void from the beginning—by the North Dakota Supreme Court. With the agreement gone as if it never existed, East Central argues the City's growth into the "Disputed Area"—an area containing more than 130 subdivisions constructed over two decades— has been an illegal curtailment of its service area resulting, in its estimate, of sixty-three million

dollars of past and future damages. But because too many fact questions remain, East Central's motion for partial summary judgment is denied.

## I.    <u>BACKGROUND</u>

The eastern border of the City of Grand Forks, North Dakota traces the Red River of the North. Occasionally, the Red River breaches the border and spills into the City. In 2000, "[t]he City's need for expansion away from the river flood plain" meant it anticipated "annexing additional territory." Doc. 111-3, p. 4. With this expansion came an anticipated expansion of the City's water services, and an increase in the City's water services meant a decrease in revenue for two neighboring, indebted rural water districts: Grand Forks-Traill Water Users, Inc. ("GFT") and Agassiz Water Users District ("Agassiz").[1]

Because the City anticipated annexing territory within the rural water system's service area, which did not include defined boundaries, the parties' sought to "avoid [ ] conflict in providing potable water" and ensure "the rights, duties and obligation, of the City and GFT/Agassiz will be known in advance of such action by the city." Id. at 4. To that end, on November 8, 1998, Mark Walker, a project engineer for the City, wrote to Bill Brudvik, counsel for GFT, asking "Will GFT consider retaining existing customers annexed into the city limits?" "No; We want out," Brudvik responded. Doc. 32-1. The parties memorialized their understanding of these issues in an agreement between the City, GFT, and Agassiz. See Doc. 15-1.

The parties' agreement—titled "Agreement Between the City of Grand Forks[,] Grand Forks Traill Water Users, Inc.[,] and Agassiz Water Users District"—was signed on January 24, 2000. Id. It addressed the City's "Growth Area," which was territory outside of then-existing city

---

[1] Agassiz is not a party to the case.

limits "where GFT/Agassiz . . . are supplying water service which may be taken over by the City, and areas where GFT/Agassiz currently have capacity to serve potential customers." Id. at 6. This "Growth Area" was demarcated in map attached to the Agreement, labeled here as Figure 1.[2] See Doc. 15-1, p. 16.



*Figure 1*

---

[2] The Agreement established a compensation scheme for potential and existing customers. For potential but not yet existing customers, the City would provide reimbursement "based upon the then-existing debt of the rural water system[s]." Doc. 15-1, p. 6. For existing customers, the City would provide compensation based on GFT and Agassiz's debt service and customer revenue. Id. at 9-10. Based on these compensation schemes, the City paid GFT $261,893.10 on February 23, 2000. Doc. 32-5.

Months after the Agreement was signed, GFT reorganized into a water district with defined boundaries that did not include the City's growth area. Doc. 32, p. 3. Meanwhile, the City continued to expand. In 2004, the City expanded and converted six GFT customers to its water service. Doc. 32-7, p. 1. GFT had also begun providing service to now-existing customers that were included the City's initial payment for potential customers. Id. at 2. By offsetting the City's converted customers against GFT's expanded service, GFT agreed to pay $11,049 to reimburse the City for its initial payment for potential customers. Id. In 2018, GFT merged with Traill Rural Water District to form East Central. See Doc. 32-4. East Central's boundary area does not include the City's growth area as described in the Agreement. See Doc. 32, p. 3-4.

The Agreement appeared to be working but absent from its formation and execution (and this litigation) was a required party—the Bank of North Dakota. North Dakota Century Code section 6-09.4-22 requires "the public financing authority" to be a party to any agreement that limits a rural water district's service area, and the absence of that public financing authority rendered any purported agreement—like the one here—"invalid and unenforceable." East Central appears to have discovered the Bank's absence in 2013, back when it was still GFT. Minutes from a February 2013 meeting of the GFT Board report it "discussed the matter of annexation," and an attorney for GFT explained, "[T]he agreement . . . made with the City of Grand Forks back in 2000 is not a binding contract as it was not signed by the lending institution." Doc. 90-7, p. 2. The City expanded again in 2016 and 2018 and requested information from East Central to calculate payments under the Agreement. It received no response. Doc. 32, p. 7.

4

East Central sued the City in 2020.[3] Doc. 1. It seeks over sixty million dollars in compensation and a constructive trust over certain infrastructure to remedy the City's incursion into the "Disputed Area"—an area that now contains more than 130 subdivisions and millions of dollars of infrastructure. See Doc. 159-17; Doc. 159-18. Recently, the question of whether the Agreement was capable of ratification was certified to the North Dakota Supreme Court, and it answered that the statute's language—"invalid and unenforceable"—means "*void ab initio*" and not capable of ratification. See E. Cent. Water Dist. v. City of Grand Forks, 2024 ND 135, ¶ 23, 9 N.W.3d 705, 713 (N.D. 2024). Following that ruling, this Court declared the Agreement void because of the absence of the Bank of North Dakota, mooted the pending motions, and invited the parties to refile any motions in light of the decision. See Doc. 138.

## II.    LAW AND DISCUSSION

East Central moves for partial summary judgment. See Doc. 150. It seeks summary judgment on its claims that the City is liable for violations of 7 U.S.C. § 1926(b) and North Dakota Century Code section 6-09.4-22. It also seeks a judgment that the City's affirmative defenses and counterclaims are meritless. Id. East Central's summary judgment motion is partial because it does not request a remedy, preferring to resolve that later. The City and Attorney Brudvik responded but did not otherwise bring their own motions. See Doc. 157; Doc. 159.

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see also Celotex Corp. v. Catrett,

---

[3] The City filed a third-party complaint against its legal counsel at the time of the Agreement, William Brudvik and Ohnstad Twichell. Doc. 53.

477 U.S. 317, 322 (1986). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (citation omitted). Though evidence is viewed in "the light most favorable to the non-movant," there must be evidence to view and "[i]f the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate." St. Jude Med., Inc. v. Lifecare Int'l, Inc., 250 F.3d 587, 595 (8th Cir. 2001).

A.    **The City's Liability**

East Central moves for summary judgment on the City's liability under a federal statute, 7 U.S.C. § 1926(b) and North Dakota's version of that statute, North Dakota Century Code section 6-09.4-22(1). Other than this case, there is no case law interpreting North Dakota's statute. So, given the similarities, the Court will draw on the precedents interpreting and applying 7 U.S.C. § 1926(b) to interpret North Dakota Century Code section 6-09.4-22(1) as well.

Congress enacted 7 U.S.C. § 1926 to, among other things, provide loans to rural water districts. See Rural Water Sys. No. 1 v. City of Sioux Ctr., Iowa, 967 F. Supp. 1483, 1511 (N.D. Iowa 1997). Section 1926(b) protects these loans by protecting the rural water district's customer base, and it does that by making "[t]he service area of a federally indebted water association . . . sacrosanct." Id. at 1524. The Eighth Circuit has stated "the primary purposes of § 1926(b) are to promote water development and safeguard the economic security of USDA-indebted water districts." Pub. Water Supply Dist. No. 1 of Greene Cnty. v. City of Springfield, Missouri, 52 F.4th 372, 374 (8th Cir. 2022).

Section 1926(b) provides that "[t]he service provided or made available" by federally indebted rural water districts "shall not be curtailed or limited by inclusion of the area . . . within

6

the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area." There is a well-established three-part test to determine if a rural water district is protected by § 1926(b). "To qualify for protection, an entity must: (1) be an 'association' under the statute, (2) have a qualifying federal loan, and (3) have provided or made service available to the disputed area." Pub. Water Supply Dist. No. 3, 605 F.3d at 521.

The City does not contest that East Central is a qualified association. See Doc. 159, p. 18 n.11. Nor does it dispute that East Central had qualifying federal and state loans at various times.[4] So the parties focus much of their arguments on the third element of § 1926(b)'s test: whether East Central made service available to the Disputed Areas. The 'made service available' determination itself has two parts: "(1) the physical ability to serve an area; and (2) the legal right to serve an area." Pub. Water Supply Dist. No. 3, 605 F.3d at 521.

East Central appears to have a legal right to serve the Disputed Areas. It points to North Dakota Century Code section 61-35-12(15) that permits a water district's board to operate "within and without the territorial boundaries of the district." N.D. Cent. Code § 61-35-12(15). This gives East Central "the right to provide service outside its boundaries." See Le-Ax Water Dist. v. City of Athens, Ohio, 346 F.3d 701, 707 (6th Cir. 2003) (addressing similar language in Ohio statute). And yet, according to a project engineer for the City, East Central's defined geographic area does not include the Disputed Areas. See Doc. 32, p. 3-4. This may raise issues apart from whether

---

[4] The service made available by the rural water district must be the "type of service financed by the qualifying federal loan." Pub. Water Supply Dist. No. 3, 605 F.3d at 520. North Dakota's statute has the same rule. See N.D.C.C. § 6-09.4-22 (providing protection to the service provided or made available "through" an improvement financed by a qualifying state loan). So, the mere fact of indebtedness is not enough—the particulars matter—but because this element is wrapped up with whether East Central made service available to the Disputed Areas, it is addressed below.

East Central has the mere right to provide service. See Le-Ax Water Dist., 346 F.3d at 707 ("When a rural water district's boundaries are geographically determined by the state, we hold that a rural water district cannot use § 1926(b) as a sword to force new customers who are outside that geographic area to receive water service through the rural water district.").

The next question is whether East Central had "the physical ability to serve an area." Pub. Water Supply Dist. No. 3, 605 F.3d at 521. This is determined using the "pipes in the ground test." Id. Under this test, "courts examine whether a water association has adequate facilities within or adjacent to the area to provide service to the area within a reasonable amount of time after a request for service is made." Id. at 523 (citations and internal quotation marks omitted).

East Central marshals two pieces of evidence to support its claim that it had the physical ability to provide service to the Disputed Areas: the Agreement and its expert report. East Central relies on the now-voided Agreement to support its motion for summary judgment (Doc. 152, p. 12) while, in a pending motion in limine, it seeks to exclude the Agreement from trial (Doc. 169). East Central argues it would be "compelled to move for a mistrial" if the Agreement were introduced at trial. Id. at 2. It is true evidence at summary judgment need not be admissible, but it must be possible for the evidence to be "presented at trial in an admissible form." Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012). Certainly the Agreement cannot support a summary judgment motion and be excluded from trial.

Both the Agreement and East Central's expert have issues resolving factual disputes. The Agreement uses qualified language—acknowledging East Central's capacity "to the extent shown." Doc. 15, p. 5. It is also speculative—the City "may" annex certain areas "in the future." Id. at 4. East Central's expert is similar. He appears to have analyzed whether East Central could provide or make service available to the Disputed Areas today based on a counterfactual starting

8

in 1997. See Doc. 111-23, p. 14. The expert writes, "If East Central Regional Water District had been servicing the Disputed Area beginning in 1997, the system would have grown incrementally over time and would not be the same as the system that is currently in place today." Id. at 8. The expert also analyzed how long it would take for East Central to be able to provide service to the Disputed Areas now, concluding it would take "16 to 30 months." Id.

Two principles articulated by the Eighth Circuit in § 1926(b) cases make it impossible to grant summary judgment on this record. First, a § 1926(b) violation begins and ends at a particular time. It is not ongoing or continuous.[5] See Pub. Water Supply Dist. No. 1, 52 F.4th at 376. This is relevant not only to a statute of limitations but also to whether a rural water district provided service or made it available at the time of an alleged violation. See Pub. Water Supply Dist. No. 3, 605 F.3d at 516. Second, the "made service available" determination is made on a customer-by-customer basis. See id. at 521 (making the 'made service available' determination on a customer-by-customer basis); see also Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cnty., Oklahoma v. City of Guthrie, 654 F.3d 1058, 1065 (10th Cir. 2011) (relying in part on Eighth Circuit precedent to proceed on a customer-by-customer basis).

These principles require determining (1) when the alleged violation occurred and (2) whether East Central made service available to that customer at the time of the alleged violation. The "made service available" determination is a precondition of protection so it must be present

---

[5] East Central argued for a "continuing violation" theory despite its rejection by the Eighth Circuit. See Pub. Water Supply Dist. No. 1, 52 F.4th at 376 ("[I]t is not a continuing violation, and the statute of limitations does not reset, when a municipality continues to add and provide service to customers in a subdivision it already serves."). The Eighth Circuit reached this conclusion in part because it "promotes finality and comports with the statute's purpose of encouraging water development because a municipality would be less inclined to invest in infrastructure to provide water service to a subdivision if a rural water district could divest the municipality of its investment decades later." Id. East Central's counsel should be aware of the Eighth Circuit's holding—they were counsel in that case.

at the time of the alleged incursion or curtailment—not years after the fact. See e.g., Lexington-S. Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 237 (6th Cir. 1996) ("[W]ater lines must either be within or adjacent to the property claimed to be protected by Section 1926(b) prior to the time an allegedly encroaching association begins providing service in order to be eligible for Section 1926(b) protection.").

Consider how these principles operated in a remarkably similar case, Pub. Water Supply Dist. No. 1 of Greene Cnty. v. City of Springfield, Missouri, 52 F.4th 372, 374 (8th Cir. 2022). In 2020, a rural water district sued the City of Springfield, Missouri for supplying water to subdivisions in its service area. There were six disputed subdivisions; Springfield supplied water to the first subdivision in 1971 and to the sixth and final subdivision in 1994. Those dates were important. The Eighth Circuit held that a § 1926(b) violation occurs when a municipality "begins providing service to a new subdivision, and not when it continues to do so." Id. at 376. Because any § 1926(b) violation occurred before or in 1994, the Eighth Circuit dismissed the rural water district's claims as outside the statute of limitations. Id. Setting aside the statute of limitations issue, the Eighth Circuit was able to distinguish between subdivisions and identify a particular point in time when the alleged § 1926(b) violation occurred. The "Disputed Areas" in this case, by contrast, contain more than a hundred subdivisions developed over decades. See Doc. 159-18; Doc. 159-19

East Central's representations about the "Disputed Areas"—a large swath of property annexed and developed by the City over time—are too capacious to make any specific factual findings about when an alleged curtailment or incursion occurred, whether East Central provided service or otherwise made it available at that time, and whether that service was possible because of a qualifying federal or state loan. See Pub. Water Supply Dist. No. 1, 52 F.4th at 376; see also

<u>Pub. Water Supply Dist. No. 3</u>, 605 F.3d at 521. This is in addition to unresolved issues related to the statute of limitations, when certain loans originated and were closed, and other time-specific matters. For these reasons, East Central's motion for partial summary judgment is denied. The Court identified these fact issues in November of 2021. <u>See</u> Doc. 61. There were, and still are, disputes of fact about "the specific purposes of the debts and the timeline of indebtedness," the "areas served" by East Central and the boundaries of its predecessors," and whether "East Central and its predecessors provided or were able to provide services to the areas at issue." <u>Id.</u> at 14-15. To resolve those factual disputes, the parties must specify the alleged § 1926(b) violations in accordance with the principles articulated above.

> **B.    The City's Affirmative Defenses and Counterclaims**

East Central also moves for summary judgment on the City's nineteen affirmative defenses and its counterclaims. "An affirmative defense is a defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true."[6] <u>Safeway Transit LLC v. Disc. Party Bus, Inc.</u>, 954 F.3d 1171, 1182 (8th Cir. 2020) (internal citations, quotation marks, and brackets omitted). So, "[g]enerally, a court addresses affirmative defenses only after finding that the plaintiff established the required element of the relevant claim." <u>Souza v. Charmed LLC</u>, 715 F. Supp. 3d 1118, 1128 (N.D. Iowa 2024). Given that East Central's motion for partial summary judgment is denied, the Court defers any ruling regarding the City's defenses. The Court will likewise defer ruling on the City's counterclaims, which are interwoven with East Central's motion for partial summary judgment.

---

[6] Not all the City's pleaded affirmative defenses are properly characterized as defenses. For example, the first two identified "defenses" are not defenses to otherwise meritorious claims. <u>See e.g.</u>, Doc. 15, ¶ 34 ("East Central's complaint fails to state a claim or claims upon which relief can be granted."); Doc. 15, ¶ 35 ("This Court lacks subject matter jurisdiction over this action by virtue of the East Central's failure to join necessary and indispensable parties.").

III.    <u>**CONCLUSION**</u>

To qualify for protection under § 1926(b) and North Dakota Century section 6-09.4-22, East Central must show it was an "association" under the statute, had a qualifying federal or state loan, and provided or made service available to the disputed area. <u>See</u> <u>Pub. Water Supply Dist. No. 3</u>, 605 F.3d at 521. That last requirement—the 'made service available' determination—itself has two parts: "(1) the physical ability to serve an area; and (2) the legal right to serve an area." <u>Id.</u> at 521. The physical ability to service must be present at the time of the alleged violation, and the facts showing that ability must relate to specific customers. East Central's references to the "Disputed Areas"—a large swath of territory annexed and developed over years—are too broad to establish those facts. For that reason, East Central's motion for partial summary judgment (Doc. 150) is **DENIED**.

East Central filed its motion early. Discovery only recently ended, dispositive motions are due by October 1, 2025, and trial is set for May 26, 2026. <u>See</u> Doc. 143. East Central has also filed four motions in limine and a motion to bifurcate the trial. <u>See</u> Doc. 140; Doc. 166; Doc. 167; Doc. 168. The City moves to stay any response deadline until all dispositive motions—including those yet to be filed—are resolved. Doc. 174. A motion in limine is a "pretrial request that certain inadmissible evidence" may not be offered "at trial." <u>Motion in Limine</u>, Black's Law Dictionary (11th ed. 2019). There is little reason for motions in limine to be filed and fully briefed before the dispositive motion deadline and close to a year before trial. For that reason, East Central's motions in limine (Doc. 140; Doc. 166; Doc. 167; Doc. 168) are **DENIED**, without prejudice, as premature.[7] The City's motion to stay its response (Doc. 174) is therefore found to be **MOOT**.

---

[7] East Central is reminded that "motions in limine are not proper procedural devices for the wholesale disposition of theories or defenses." <u>See</u> <u>SPX Corp. v. Bartec USA</u>, No. 06-14888, 2008

The Court encourages the parties to refrain from filing any motions related to trial or other matters until all dispositive motions, including those yet to filed, are resolved. The docket has become a tangled mass, and the parties ought not exacerbate that.

**IT IS SO ORDERED**.

Dated this 28th day of August, 2025.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

---

WL 3850770, at *3 (E.D. Mich. Aug. 12, 2008); see also Doc. 166 (motion in limine to "exclude evidence and argument concerning equitable defenses.").